THE INHABITANTS OF THE TOWNSHIP OF GREENWICH, IN THE COUNTY OF WARREN, *vs.* THE EASTON AND AMBOY RAILROAD COMPANY.

1. Township authorities have a special interest in its highways, beyond that of the public at large, and may properly file a bill in their corporate name, to restrain an unwarranted, unjustifiable, and injurious interference with its highways, threatening special injury to the township, of a character and extent such as to call for the preventive aid of equity.

2. A grant of power in laying out and constructing a railroad, to change the location of any public road if the company shall find it necessary, and to occupy such portions of the road as they may deem necessary or expedient—the company, in such case, to cause the changed portion of such road to be reconstructed at their own expense, in as perfect a manner as the original road—does not authorize the diversion of an ancient highway, because the company find it to their pecuniary advantage or convenience to make such diversion. The alteration or diversion must be a necessary one.

3. A grant of new and extraordinary power to a private corporation, in contravention of the established rights of the public, must be construed with a reasonable strictness.

On order to show cause why an injunction should not issue. Argued on bill, answer, and affidavits.

*Mr. J. M. Robeson* and *Mr. Vanatta,* for complainants.

*Mr. J. G. Shipman* and *T. N. McCarter,* for defendants.

THE CHANCELLOR.

The bill is filed by the corporate authorities of the township of Greenwich, in the county of Warren, to restrain the defendants, The Easton and Amboy Railroad Company, from shutting up, with the embankment of their railway, a part of an ancient public highway in that township. The line of the railroad crosses the highway in question, and it crosses, also, the Pohatcong creek, from the nearer bank whereof, as the creek would run naturally, the highway is

distant about thirty feet. The company's plan involves the change of the bed of the creek (removing it about one hundred feet further from the old highway,) at the place of crossing; providing for the passage of the water through a culvert about thirty-five feet in width, which is to support the embankment on which their track is to be laid ; the vacation of about thirteen hundred feet of the highway, and the substitution therefor of another road, about fifteen hundred feet long, which, leaving the old road, will run diagonally to the new line of the creek for about six hundred feet, and will then run alongside of the creek for over three hundred feet, and then diagonally about five hundred feet to the old road. For the width of the base of the embankment, over three hundred feet, (the embankment is to be one hundred and twenty-three feet, or thereabouts, in height,) the proposed road is to run alongside of the creek. The road is to be carried under the embankment through another culvert. The object of this alteration of the road is manifestly, if not avowedly, to provide for the relief of the creek culvert, by means of the road culvert, in times of freshet. By this arrangement, the creek culvert may be made smaller than it otherwise could be, consistently with a prudent regard to safety. At the crossing of the highway, whether in its present location, or as the company propose to alter it, there must be a culvert. By constructing the culverts alongside of each other, the advantages above mentioned, in reference to the waters of the creek, will be gained.

It is insisted, and I think it fully appears, that the proposed new location of the road would be objectionable, because for almost its whole length it will be upon the low ground through which the creek flows, and therefore the road would be more difficult to maintain in repair, and would also be liable to overflow. The present highway is about seven feet higher than the level of the bank of the creek in its natural location. The land adjacent to the creek, over which the new road is to be made, is low and flat. The creek is subject to sudden rises, and the road must, therefore,

in view of the liability to inundation, be raised by a causeway above the level of the land. The complainants object to the proposed alteration and substitution, on the ground that the defendants have no authority to make them, and that if they have such authority, they have no right to close up the present road before they shall have provided a proper substitute for it. Such substitute they have not yet provided, although they are proceeding to fill up with their embankment the present road, thus rendering it impassable.

The most important questions in this cause are, whether this action can be maintained by the complainants, and whether the defendants are authorized by their charter to make the proposed alterations in the highway.

As to the first: The defendants insist that the apprehended injury is to the general public, who, alone, represented by the attorney-general, have a right to complain of it, and to ask the interdict of this court in the premises. This objection would be valid if the township had no other interest in the subject than that which they possess in common with the public at large. It is true that the entire community, in whatever part of the state abiding, have an equal right to all the privileges of the public highways as such, in any township, and have an equal right to complain of any infraction of those privileges. But it is equally true, that in the public highways within its limits every township has a special interest, arising from the obligation imposed by law upon it to maintain and repair them at its own expense; a duty, the discharge of which the law stands ready to enforce by indictment and the penalties consequent upon conviction. By statute, (*Nix. Dig., p.* 842, § 113,) the townships of this state are made liable, civilly, for damages arising from the insufficiency or want of repair of the public roads within their limits. The county of Warren however, is, with certain other counties, excepted from the provisions of that act.

A township sustains, therefore, in the destruction of any of its public highways, a special injury beyond that of the public in general. In the proposed subtitution of a new

highway for an old one, it has a special interest beyond that of the community at large, to the extent of the additional burthens which may thus be thrown upon it; as in the present case, where the location of the road which it is proposed to substitute, will be less advantageous than that of the old one, and the new road will be more difficult to maintain and keep in repair, and, therefore, more expensive to the township.

This special interest has been recognized by tribunals, both of law and equity, in other states. In *The Inhabitants of Springfield* v. *The Connecticut River Railroad Co.*, 4 *Cush.* 63, it was held that a town might proceed in equity, in the Supreme Judicial Court of Massachusetts, under the general jurisdiction of that court in matters of nuisance, in order to ascertain whether a railroad company might, under a general grant of power, lay out and construct their road over and along a public highway of the town; and that it was immaterial, in this respect, whether the way in question was a highway, properly so called, or a town way. In *The Town of Troy* v. *The Cheshire Railroad Company*, 3 *Foster* 83, it was held that towns have a qualified interest in the roadways they have constructed, and may maintain an action on the case for the destruction and obstruction thereof.

This special interest is sufficient to entitle a township to the consideration and protection of this court, upon the application of its corporate authorities for relief, in all cases of reasonable apprehension of an unwarranted, unjustifiable, and injurious interference with its highways, threatening special injury to the township, of a character and extent such as to call for the preventive aid of equity. Upon these authorities, the duty of prosecuting and defending the common rights of the township is, by the eleventh and twelfth sections of the act under which the townships in the state are organized, devolved. *Nix. Dig.* 979.

It is established, that a municipality which, by its charter or constituent act, has the control and supervision of the streets and public places in its limits, may, in its corporate name, institute judicial proceedings to prevent or remove

obstructions thereon. 2 *Dillon on Mun. Corp.*, § 521. It was so held in *The Hoboken Land and Improvement Co.* v. *The Mayor, &c., of Hoboken,* decided by the Court of Errors and Appeals, June Term, 1873; and the like view was entertained by the Supreme Court of this state, in *Dummer* v. *Jersey City, Spencer* 86, and in *Trustees, &c.,* v. *Council of Hoboken,* 4 *Vroom* 19. *In Trustees of Watertown* v. *Cowen,* 4 *Paige* 513, Chancellor Walworth held that the corporation of a village was (though he declined to hold that the legal title was vested in them) the proper representative of the equitable rights of the inhabitants to the use of a square which had been dedicated to public use, so as to authorize the filing of a bill in equity, by the corporation, to protect those equitable rights against the erection of a nuisance thereon.

The defendants are a corporation formed by the consolidation of The Bound Brook and Easton Railroad Company and The Perth Amboy and Bound Brook Railroad Company. The act authorizing the consolidation, (*Pamph. L.,* 1872, *p.* 1017,) provides that the consolidated company shall, in all respects, act and be governed by the laws then in force, respecting The Bound Brook and Easton Railroad Company, so far as the same shall be applicable. The tenth section of the charter of the last named company, (*Pamph L.,* 1872, *p.* 314,) provides that it shall be the duty of that company to construct and keep in repair, good and sufficient bridges and passages over or under the railroad, where any public or other road shall cross the same, so that the passage of carriages, horses, and cattle on such road shall not be impeded thereby.

By the third section of an act, termed a supplement to the charter of the Easton and Amboy Railroad Company, (*Pamph. L.,* 1873, *p.* 1324,) it is enacted that, if the company shall find it necessary to change the location of any portion of any turnpike or other public road, they are thereby authorized and empowered so to do, provided that such privilege shall not apply to any street or highway which, at the time of the approval of the act, should have been graded or paved in any incorporated city or town of this state, or any road or

highway in the township of Raritan, or city of Perth Amboy, except those located upon the property of said company; and to occupy such portions of the turnpike or road as they may deem necessary or expedient; and that, in such case, they shall cause the changed portion of such turnpike or public road to be reconstructed at their own expense, in as perfect a manner as the original road or turnpike, and pay all the damages done to real estate by such removal of roads and turnpikes.

The defendants insist that, by the section just quoted, they are empowered to alter any public highway which their railroad crosses, if, in their opinion, it is more convenient or economical for them so to do, although such alteration may not be strictly necessary; provided they comply with the provisions of the section as to substitution. This construction would, in effect, subject every highway which the railway may cross from Phillipsburg to Perth Amboy, with the exceptions made in the section under consideration, to alteration, at the mere will of the company; not because the necessities of public travel, whether on the common road or on their railway, demand; not because the protection of the traveling public requires it, but merely because the company find it either to their pecuniary advantage, or to their convenience, to make such alteration.

In this case, they seek to justify the vacation of the portion of the existing road, by a consideration in nowise connected with the highway. The proposed substitution will not relieve them from the necessity of crossing the highway. They must cross it in the new location, and must provide the same means of passage for it under their embankment. No consideration of public safety or public convenience is advanced. The engineering, which provides only a culvert of but thirty-five feet in width for the passage of the waters of the creek, must make some supplementary provision for the relief of that culvert in times of flood. This relief, the road culvert is to furnish. Nothing is needed beyond the

bare statement of this proposition, to make manifest the abuse of corporate power which is contemplated.

It is the duty of this court to give to the provision of the charter under consideration, a reasonable construction; to secure to the company all the privileges the legislature intended to bestow upon them; but, beyond that, it ought not to permit them to go.

The defendants contend that their construction of the section giving them authority to change the location of roads and turnpikes, is warranted by the language of the Supreme Court, in *The State, N. J. R. R. & T. Co., pros.,* v. *Hancock,* 6 *Vroom* 537, in reference to the signification of the word "necessary," when used in connection with the grant of powers to railroad corporations. But, in that case, the subject under consideration was the limitations which judicial construction would put upon a general exemption from taxation, contained in the charter of a railroad company, in respect to what property the company, in such case, would be entitled to the benefit of the exemption; whether it should be only that which is indispensably necessary to effect the purposes of the corporation, or that, also, which, although not indispensable, is appropriate and convenient to carry into effect the franchise granted. The question was not there, as it is here, upon the construction of the word as a limitation of a grant of power to a company to do a certain act in derogation of public rights. The latitude and liberality proper in the one case, cannot be permissible in the other. A grant of new and extraordinary power to a private corporation, in contravention of the established rights of the public, must be construed with a reasonable strictness.

In *Warren Railroad Company*, ads. *The State,* 5 *Dutcher* 353, Chief Justice Whelpley said, in construing a provision in the charter of that company, which gave them the power "to alter and grade any public or other road which should cross their railroad," "it is claimed that the words alter and grade the said public or other roads, &c., are of sufficiently large import to include changing the route of the road. No

such construction should be given to these words by unnecessary implication. Public highways ought not to be destroyed even in part, under pretence of legislative authority, unless it be conferred either in express terms or by necessary implication. If the words are ambiguous, the construction ought to be in favor of the common right of highway, not against it. See also *Morris & Essex R. R. Co.* v. *The Mayor, &c., of Newark,* 2 Stockt. 352, 362, 363.

· In *Regina* v. *Wycombe Railway Co.,* L. R. 2 Q. B. 310, the very question now under consideration was before the court, but under a statute, (The Railways Clauses Consolidation Act, 1845, 8 *Vict.,* c. 20, § 16,) more favorable to the construction contended for by the defendants in this suit. By that act the company were empowered " to divert or alter, as well temporarily as permanently, streets, or roads, or ways; or sink the level of them, in order the more conveniently to carry the same over, or under, or by the side of the railway, as they might think proper." Cockburn, Chief Justice, said : " Now, if these words stood alone, it might be contended that it was at the option of the railway company to divert a road, provided it was done in the construction of the railway. But I think the legislature never could have intended to invest a company with powers so large, so unlimited, and so entirely discretionary, to interfere either with public or private rights; therefore, I am not surprised that, both at the beginning and at the end of the section, the language plainly shows that the legislature intended to limit the power by some qualification. The section begins thus : 'Subject to the provisions and restrictions of this, and the special act, and any act incorporated therewith, it shall be lawful for the company, for the purpose of constructing the railway, or the accommodation works connected therewith, to execute any of the following works; and *inter alia,* to divert roads.' I think that this portion of the section must be read with the last paragraph, ' they may do all other acts *necessary for making,* maintaining, altering, or repairing, and using the railway.' Now, the construction that I put

upon the whole section is, that the power conferred on a rail-
road company, for the construction of their railroad, is con-
fined to matters which are not only done in the construction
of the railway, but which are necessary for its construction.
* * * * The question is, was the diversion necessary
for the formation and construction of the railway? Neces-
sary it was, perhaps, in one sense, looking at the convenience
of the company economically; but by no means necessary in
any other point of view. But we are not to look at the con-
venience of the company alone, but to the accommodation
and convenience of those who have rights of property which
are interfered with, of those who have immediate access to the
road, or persons using it of necessity in the ordinary course
of their business. It was not necessary for the construction
of the railway, that the road should have been permanently
diverted, it might have been carried over the railway, or
under it; it was merely less expensive to the company, to
divert the road as they have done, than to carry it over or
under, as they ought to have done, and as they were required
by the act of parliament. I think that this return (the case
was before the court on mandamus) is bad. It alleges that it
was necessary, for the purpose of constructing the railway,
that the road should be diverted, and that by virtue of the
powers of the act, and the acts incorporated therewith, they
did permanently divert the road. The question whether that
is true or not, turns entirely upon the construction to be put
upon the term " necessary," in section sixteen. I think the
meaning we ought to give to the word is, that it is only neces-
sary, for the construction of the railway, to permanently
divert the road, when the railroad cannot be made without so
diverting it."

The necessity for diverting the highway, may be one of
engineering. It is not claimed that any such exists in this
case. Again, it may be one arising from the requirements of
the public convenience or safety, considered as well with ref-
erence to the use of the one road as the other, the railway
as well as the common highway. It is not claimed that there

is any such here ; but, it is insisted that the company have power, under the act, to divert the road though there be no necessity, strictly speaking, or according to the ordinary meaning of the term, for so doing ; that they may exercise the power upon the consideration of the saving of expense alone.

The rights of the public in this matter are plain. There appears to be no necessity for diverting the highway. The public are therefore entitled to the road as and where it is. The duty of the company in the premises is equally plain. It is to construct and keep in repair a good and sufficient passage for the highway under their railroad, so that the passage of carriages, horses, and cattle, on the highway, shall not be impeded thereby. Nor can they avoid the full discharge of their obligations to the public, in this respect, according to the intention and plain requirements of the legislature, by the plea of economy. In a note to *Regina* v. *Sharpe*, 3 *Eng. R. & C. Cas., p.* 35, Baron Parke is reported to have said, that in a case tried before him, as to the power a company had to make a road over a public highway, he laid it down, that if possible, the work must be constructed without any inconvenience to the public ; but if it could not be done without some such inconvenience, it must be done with the least possible, according to the provisions mentioned in the act. It is added that this was the case of Regina *v.* The London and Southampton Railway Co., tried at the Hants Summer Assizes, in 1838, in which his lordship held that mere expense was no reason for not making a road over the cutting as convenient as before.

The following language of Chancellor Williamson, in The Morris and Essex Railroad Co. *v.* The Mayor, &c., of Newark, is pertinent to the entire subject under consideration : " The legislature of the state has conferred upon certain corporate bodies, the control and supervision of the public highways. These bodies are responsible for the proper maintenance and repair of these ways. They may be arraigned before the criminal tribunals of the land, for a neglect of duty in

the execution of the trust committed to them. These provisions for the protection of travel, where railways cross highways, are made for the benefit of the public, and for its protection. The public have rights in the public highways of the state, which can be impaired or interfered with by nothing short of authority conferred by the sovereign power of the state, itself. That authority must be *expressly* given; or, if conferred by *implication*, it must be a *necessary* implication, such as will necessarily and naturally flow out of the law from whence it is derived, not a necessary implication, to be whittled down into a reasonable intendment, and the to become a mere matter of expediency, and then to be resolved into a mere question of dollars and cents."

The view I take of this question, renders it unnecessary to consider whether, if the company have the power to divert the highway, they can lawfully obstruct and destroy the old road, before they shall have provided an equally good and safe one instead of it.

The complainants have a standing in court in this suit. They are authorized to ask the relief they seek. They have been guilty of no laches, nor are they barred of their remedy, or right to relief, by any acquiescence. Their right is not doubtful. The defendants threaten to do an act which is *ultra vires*, one that will be specially injurious to the complainants. It is the duty of this court to interfere to prevent it.

The order to show cause is made absolute.